***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner. The appealing parties have shown good grounds to reconsider the evidence, and having reviewed the competent evidence of record, the Full Commission hereby modifies and affirms the Opinion and Award of the Deputy Commissioner.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as
 STIPULATIONS
1. All parties are properly before the Commission and that the Commission has jurisdiction over the parties and the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of the parties.
3. The appointment of any party who appears in a representative capacity is valid and that said party has duly qualified and has authority to appear in the capacity in which said party is designated, and that no further proof of appointment or capacity shall be required.
4. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
5. An employee-employer relationship existed between the plaintiff and defendant and its successors and assigns from September 18, 1992 through the present.
6. Plaintiff sustained an occupational injury on September 18, 1992, to wit, bilateral carpal tunnel syndrome, which was accepted by defendants as a compensable occupational injury by way of a Form 21 agreement approved by the Industrial Commission on December 2, 1992; wherein the defendants agreed to pay plaintiff for "necessary weeks" at the compensation rate of $243.48 based on an average gross weekly wage of $365.20.
7. Plaintiff sustained an occupational injury on January 3, 1995, to wit, right carpal tunnel syndrome, which was accepted by defendants as a compensable occupational injury by way of a Form 21 agreement approved by the Commission on April 20, 1995, wherein defendants agreed to pay plaintiff for "necessary weeks" at the rate of $239.48 based on an average gross weekly wage of $359.20.
8. In addition, the parties stipulated into evidence the following:
 A. Computer printouts showing payments made by Liberty Mutual Insurance Company.
 B. Packet of medical records and reports which were submitted after the hearing.
 C. Packets of plaintiff's employment records which were also submitted after the hearing.
The Pre-Trial Agreement dated April 30, 2001 which was submitted by the parties to the Deputy Commissioner is incorporated by reference.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following
 FINDINGS OF FACT
1. In February 1973 plaintiff, who was born on September 24, 1949 and who was a high school graduate, began working at the hosiery company then owned by Buster Brown Apparel (Buster Brown). Except for periods from 1977 to 1978 and from 1982 to 1985, she worked at the hosiery company as a sewing machine operator until January 2000. Her job was to sew the seam at the toes of socks. The socks came down through pipes to her work station. She would reach through a small hole to grab one. She then put it over a rod, operated a vacuum pump with her knee to suck the sock inside out, sewed the seam, placed the sock back over the rod and operated the vacuum to get the sock right side out so that she could then inspect the seam. She was paid based upon her production and, in order to make a living wage, she would have to complete the entire process in approximately ten seconds.
2. Due to the nature of her job, plaintiff was constantly using her hands to pull, pinch and turn the socks. The pace was very fast, as fast as she could work.
3. In 1992, plaintiff developed carpal tunnel syndrome in both of her hands. She was treated by Dr. Dunaway, an orthopedic surgeon, who advised that her condition was due to the repetitive nature of her work. He performed endoscopic surgery to both of her hands in separate operations in order to release each carpal tunnel. Her symptoms essentially resolved following the operations and she was able to return to work without restrictions.
4. In I.C. No. 270062 defendants Buster Brown and Liberty Mutual Insurance Company (Liberty Mutual) admitted liability for benefits under the Workers' Compensation Act for plaintiff's bilateral carpal tunnel syndrome and paid compensation to her for temporary total disability pursuant to a Form 21 agreement which was approved by the Industrial Commission. Compensation was paid from October 28 through December 27, 1992. Dr. Dunaway did not address the issue of permanent partial disability in his final office note; however, since she had a complete recovery, Dr. Dunaway subsequently indicated that plaintiff would have reached maximum medical improvement in early 1993 with no permanent partial impairment.
5. Plaintiff returned to work in her former job and continued to sew sock seams. In January 1995 she developed recurrent symptoms and returned to Dr. Dunaway. Her symptoms were worse in her right hand, although both hands were bothering her at that time. Nerve testing revealed worse findings in the left hand, but since her pain and numbness were worse on the right, Dr. Dunaway decided to operate on the right hand. He performed an open carpal tunnel release on February 28, 1995 and found that the ligament across her wrist had regenerated since the previous operation and that she had the classic findings of median nerve compression associated with carpal tunnel syndrome.
6. Despite the surgery, plaintiff remained symptomatic. Dr. Dunaway referred her to physical therapy but she missed a significant number of her appointments due to an unrelated health problem. In June, plaintiff told Dr. Dunaway that she needed to return to work before July 4 for financial reasons, and he allowed her to go back to work on June 26, 1995. She went back to her former position at that time but was unable to work as fast as she had previously worked due to pain and stiffness in her hands. Consequently, her wages, which were based upon production, were reduced. After working for approximately one week and then taking a week's vacation, plaintiff went out on sick leave for treatment and surgery for a breast lesion which proved not to be cancerous. She was out of work with her unrelated breast condition until October 1995.
7. Dr. Dunaway continued to follow plaintiff's recovery until March 29, 1996. He recommended that she be given a job as an inspector and indicated that she should not be working in a job with repetitive hand motion. He did not believe that she would be able to do her former production work. Nevertheless, plaintiff did return to work in her former capacity in October 1995 since an inspection job was not available. However, she had to take narcotic pain medication in order to work and to sleep. Since the second operation had not given her much relief from her right hand symptoms, plaintiff and Dr. Dunaway decided against surgery to the left hand.
8. On March 29, 1996 Dr. Dunaway released plaintiff at maximum medical improvement. Again Dr. Dunaway did not address the issue of permanent partial impairment. In retrospect, however, he advised that plaintiff would have had a ten percent permanent partial disability to each hand. Defendants Buster Brown and Liberty Mutual never paid compensation to plaintiff for her permanent impairment.
9. In I.C. No. 506551, defendants Buster Brown and Liberty Mutual admitted liability for benefits under the Workers' Compensation Act for the 1995 episode of carpal tunnel syndrome pursuant to a Form 21 agreement which was approved by the Industrial Commission. Liberty Mutual paid compensation to plaintiff for temporary total disability from January 14 through June 25, 1995. However, Liberty Mutual did not pay any compensation to plaintiff for temporary partial disability or for permanent partial disability, either for her impairment rating or for her loss of earning capacity.
10. Computation of plaintiff's loss of earning capacity after she returned to work in June 1995 is complicated by the fact that plaintiff was out of work, or otherwise lost production, due to unrelated medical treatment, particularly for her breasts, and due to plant closings. Therefore, use of wage information which includes time lost from work for unrelated medical care and plant closings is not fair to both parties. Rather, under the circumstances of this case, it is fair to compute the post-injury earnings based on plaintiff's earnings over the days that she actually worked to arrive at an average post-injury wage. A calculation based on the difference between pre-injury average weekly wage and an average post-injury weekly wage based on actual time worked is fair for both parties and more accurately reflects what plaintiff would have earned had she worked in the periods when she was out of work due to unrelated injuries and plant closings/layoffs. Further, because this formula does not inflate plaintiff's lost earnings based on time lost for unrelated medical care and plant closings, there is no need to apply a credit for short term disability benefits and unemployment benefits, because the earnings covered by these benefits were not included in the calculation. In the Form 21 agreement the parties stipulated that plaintiff's pre-injury average weekly wage was $359.20. Based on the evidence of record, plaintiff's post injury wages support the payment of compensation as follows:
 a. 1995: plaintiff earned $1762.16 over 43 days for an average daily wage of $40.98 and an average weekly wage of $204.90,[1] which results in an average weekly loss of $154.29 and a weekly compensation payment in the amount of $102.87 for each week of 1995 after plaintiff returned to work on June 25, 1995;
 b. 1996: plaintiff earned $9160.17 over 218 days for an average daily wage of $42.02 and an average weekly wage of $210.10, which results in an average weekly loss of $149.10 and a weekly compensation payment in the amount of $99.40 for each week of 1996.
 c. 1997: plaintiff earned $11,348.40 over 251 days for an average daily wage of $45.21 and an average weekly wage of $226.05, which results in an average weekly loss of $133.15 and a weekly compensation payment in the amount of $88.76 for each week of 1997.
 d. 1998: plaintiff earned $10,428.53 over 210 days for an average daily wage of $49.66 and an average weekly wage of $248.30, which results in an average weekly loss of $110.90 and a weekly compensation payment in the amount of $73.93 for each week of 1998.
 e. 1999: plaintiff earned $11,480.01 over 256 days for an average daily wage of $44.84 and an average weekly wage of $224.20, which results in an average weekly loss of $135.00 and a weekly compensation payment in the amount of $90.00 for each week of 1999.
 f. 2000: plaintiff only worked 1 day in 2000 and subsequently is off from work for an aggravation to her compensable injury. It is fair and reasonable to continue the 1999 compensation payments of $90.00 per week until the 300 week period from the date of the 1995 injury is completed. Payment of these benefits, in addition to payment for benefits for the 2000 claim does not result in a double recovery because the $90.00 represents compensation for the diminution of earnings from 1995 to 1999 and the compensation benefits for the 2000 injury are based on the lesser 1999 earnings.
11. Although plaintiff sustained a ten-percent permanent partial disability to each hand as a result of the carpal tunnel syndrome for which she was treated beginning in January 1995, she would receive more compensation for her actual wage loss. Consequently, she has elected, through counsel, to receive partial disability benefits pursuant to G.S. § 97-30 instead of G.S. § 97-31.
12. Plaintiff did not see Dr. Dunaway between March 1996 and October 7, 1999 when she went to him for some unrelated problems with her legs. However, she advised him at that time that she was having numbness and pain in both of her hands. When she returned to him on November 11, 1999, she was having burning and numbness in both feet and she was concerned that she might have multiple sclerosis, so Dr. Dunaway referred her to Dr. Hill, a neurologist, for evaluation. He assumed at that time that most of her problems stemmed from her uncontrolled diabetes.
13. Dr. Hill examined plaintiff on December 7, 1999 and performed electrodiagnostic tests which indicated evidence of peripheral neuropathy, likely due to her diabetes. He recommended medication changes. When plaintiff next saw him in January, he decided to perform further tests to evaluate whether she also had carpal tunnel syndrome, and the test results confirmed that there was active compression of the median nerves in her wrists. Because plaintiff also asked him to evaluate the possibility that she had multiple sclerosis, he ordered an MRI of her brain, which did reveal findings suspicious for the disease. Further testing in Dr. Hill's office did not confirm the findings, however, and he was unable to do a spinal tap before she stopped seeing him apparently due to insurance and financial issues. Consequently, Dr. Hill never made the clinical diagnosis.
14. On January 12, 2000 plaintiff returned to Dr. Dunaway stating that her hands were miserably uncomfortable. Her left hand was more symptomatic than her right hand at that time. Consequently, Dr. Dunaway took plaintiff out of work and recommended surgery to her left wrist which would involve an open release of the carpal tunnel. However, plaintiff could not have the operation without authorization for the surgery under workers' compensation and by that time the hosiery company had been sold to Gateway Hosiery Mills (Gateway), who had had insurance coverage with three different companies over the course of the previous three years. Liberty Mutual would not accept liability for the claim since it was no longer the carrier on the risk and since plaintiff probably had had an injurious exposure subsequent to its coverage period. Gateway and its carriers also denied liability for the claim. Consequently, plaintiff did not receive further medical care.
15. Plaintiff did have uncontrolled diabetes and her diabetic condition had caused her to develop peripheral neuropathy. However, the doctors were able to distinguish that condition from her carpal tunnel syndrome. Due to the repetitive hand movements required by her job as a sewing machine operator, plaintiff was placed at an increased risk of developing carpal tunnel syndrome as compared to the general public not so employed. Her job activities were a significant contributing factor in the development of her carpal tunnel syndrome symptoms in January 2000.
16. Plaintiff only worked one day in January 2000 when Business Insurance Company was the carrier on the risk. Dr. Dunaway was of the opinion that one day's work would not be sufficient to augment her condition to any degree, although it did temporarily increase her symptoms. In his opinion, it took a 9 to 12 month period to have a causal relationship. Plaintiff was last injuriously exposed to the hazards of carpal tunnel syndrome during 1999 when Kemper Insurance Company (Kemper) was the carrier on the risk. Her work activities during that year augmented her disease process by materially aggravating her carpal tunnel syndrome so that she became sufficiently symptomatic that surgery was necessary.
17. Plaintiff's average weekly wage as of January 2000 was $260.06.
18. As a result of her recurrent carpal tunnel syndrome, plaintiff was unable to work in any capacity from January 12, 2000 through the date of hearing on April 30, 2001. Plaintiff has not reached maximum medical improvement by the date of hearing because she has not received necessary medical treatment, including the surgery recommended by Dr. Dunaway. Consequently, no findings are made regarding the extent of permanent disability plaintiff may sustain as a result of her condition.
19. Plaintiff apparently did not know that her prescription expenses would be covered by the workers' compensation insurance carrier, so she did not submit her expenses to Liberty Mutual for either the 1992 or the 1995 claim. She has not submitted receipts or a Form 25P into evidence. Consequently, the amount of those expenses cannot be determined.
20. Secondary to her carpal tunnel syndrome, plaintiff has claimed that she developed depression. However, her medical reports referred to other issues in her life and the treating physician with respect to her depression did not testify in the case. Neither Dr. Dunaway nor Dr. Hill treated her for depression. Consequently, plaintiff has not proven that her depression was a proximate result of her occupational disease.
21. Dr. Hill found evidence of ulnar nerve entrapment in the elbow and wrist when he performed nerve testing on plaintiff. Plaintiff has claimed that these conditions would also constitute an occupational disease. However, Dr. Dunaway was of the opinion that those conditions were not associated with repetitive motion based upon the literature and in his practice. His opinions have been given greater weight since he would treat the problems as an orthopedic surgeon. Consequently, the ulnar nerve entrapment was not occupational disease which was due to causes and conditions characteristic of her employment and which excluded ordinary diseases of life to which the general public was equally exposed.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following
 CONCLUSIONS OF LAW
1. (I.C. No. 270062) In that plaintiff sustained no permanent partial disability as a result of her September 18, 1992 episode of carpal tunnel syndrome, defendants made final payment in that case when Dr. Dunaway released her from his care. That claim is therefore closed. G.S. §97-47.
2. (I.C. No. 506551) In that defendants never paid compensation to plaintiff for temporary partial disability or permanent partial disability for her January 3, 1995 episode of carpal tunnel syndrome, that claim remains pending and G.S. § 97-47 does not apply. G.S. § 97-47;see Giles vs. Tri-State Erectors, 287 N.C. 219, 214 S.E.2d 107 (1975).
3. (I.C. No. 506551) Plaintiff is entitled to compensation for temporary partial disability at the rate of $102.86 for the 27 week period from June 26 through December 1995. G.S. § 97-30.
4. (I.C. No. 506551) Having elected to receive compensation for actual wage loss in lieu of her rating, plaintiff is entitled to compensation for permanent partial disability at the rate of two-thirds of the difference between her former average weekly wage of $359.20 and the weekly wages she was able to earn after her injury. G.S. § 97-30. Her compensation rate in 1996 would be $99.40, in 1997 would be $88.76, in 1998 would be $73.93 and in 1999 would be $90.00. Since she had to stop working in January 2000 due to recurrent symptoms and since her average weekly wage was less at that time than what she would have been earning except for the 1995 episode of her carpal syndrome, she is entitled to continuing compensation at the rate of $90.00 per week until the end of the 300-week period allowed by statute, or until further order of the Commission. G.S. § 97-30; Gupton v. Builders Transport,320 N.C. 38 (1987).
5. (I.C. No. 506551) Plaintiff is entitled to have defendants provide all medical compensation arising from her occupational disease, including the prescription medicine arising from the occupational disease but excluding treatment for her depression. G.S. §§ 97-2(19); 97-25.
6. (I.C. No. 022164) In that plaintiff sustained another injurious exposure to the hazards of her carpal tunnel syndrome in 1999, defendants Gateway and Kemper are liable for the workers' compensation benefits arising from the aggravation of and/or recurrence of her carpal syndrome in January 2000. G.S. § 97-57.
7. (I.C. No. 022164) As of January 12, 2000 plaintiff developed recurrent carpal tunnel syndrome which was an occupational disease due to causes and conditions characteristic of and peculiar to her employment and which was not an ordinary disease of life to which the general public was equally exposed. G.S. § 97-53 (13). Booker v. Duke MedicalCenter, 297 N.C. 458 (1979).
8. (I.C. No. 022164) Plaintiff is entitled to compensation for temporary total disability at the rate of $173.38 per week from January 12, 2000 through the date of hearing on April 30, 2001 and continuing thereafter until she returns to work or until further order of the commission. G.S. § 97-29.
9. (I.C. No. 022164) Plaintiff is entitled to have defendants provide all medical compensation arising from this occupational disease, including necessary on-going treatment. G.S. §§ 97-2(19); 97-25.
10. Plaintiff's ulnar nerve entrapment was not an occupational disease which was due to causes and conditions characteristic of and peculiar to her employment with defendant-employer and which excluded all ordinary diseases of life to which the general public was equally exposed. G.S. § 97-53 (13); Booker v. Duke Medical Center, 297 N.C. 458 (1979).
11. Plaintiff's depression was not established to be an occupational disease arising from her employment or her compensable injuries and thereby is not compensable. G.S. §§ 97-2(6), 97-53(13).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. (I.C. No. 506551) Defendants Buster Brown and Liberty Mutual shall pay compensation to plaintiff for temporary partial disability at the rate of $102.87 for the 27 weeks after June 25, 1995. This compensation has accrued and shall be paid in a lump sum subject to the attorney's fee hereinafter approved.
2. (I.C. No. 506551) Defendants Buster Brown and Liberty Mutual shall pay compensation to plaintiff for permanent partial disability at the rate of $99.40 per week from January 1, 1996 through December 31, 1996, at the $88.76 per week from January 1, 1997 through December 31, 1997, at the rate of $73.93 per week from January 1, through December 31, 1998 and at the rate $90.00 per week from January 1, 1999 until the end of the 300-week period. This compensation has accrued and shall be paid in a lump sum subject to the attorney's fee hereinafter approved.
3. (I.C. No. 506551) Defendants Buster Brown and Liberty Mutual shall pay all medical expenses incurred by plaintiff as a result of this occupational disease, including those arising from prescription expenses. However, defendants are not liable for the treatment of her depression.
4. (I.C. No. 022164) Defendants Gateway and Kemper shall pay compensation to plaintiff at the rate of $173.38 per week from January 12, 2000 through April 30, 2001 and continuing thereafter until she returns to work or until further order of the Commission. That portion of this compensation which has accrued shall be paid in a lump sum. This award is subject to the attorney's fee hereinafter approved.
5. (I.C. No. 022164) Defendants Gateway and Kemper shall pay all medical expenses incurred by plaintiff as a result of this occupational disease, including those arising from necessary on-going treatment.
6. An attorney's fee in the amount of twenty-five percent of the compensation awarded is approved for plaintiff's counsel. He shall receive a lump sum from the accrued compensation. Defendants Gateway and Kemper shall then pay plaintiff's counsel every fourth check of continuing compensation.
7. Defendants Buster Brown and Liberty Mutual and defendants Gateway and Kemper shall pay the costs in equal shares and shall reimburse the other carriers for deposition fees, if any, paid by the other carriers.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
[1] Plaintiff was working a five day work-week. Therefore, for these calculations, the average weekly wage is computed on a 5-day work week in order to compare a pre-injury 5-day work week with a post-injury 5-day work week. These figures differ from the suggestion in Liberty Mutual's brief because Liberty Mutual uses a 7-day work week for the period post injury.